Fred THIER

v.

**LYKES BROS., INC. and Lykes Bros. Steamship Co., Inc.**

Civ. A. No. G–94–373.

United States District Court, S.D. Texas, Galveston Division.

Sept. 14, 1995.

Ernest H. Cannon, Ernest Cannon & Associates, Houston, TX, for Fred Thier.

Clayton Davis, Lundy & Dwight, Lake Charles, LA, for Lykes Brothers Incorporated, Lykes Bros. Steamship Co., Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

#### I.

#### PROCEDURAL HISTORY

The instant cause came on for non-jury trial commencing on Thursday, June 1, 1995 and concluding on June 8, 1995, the Honorable Samuel B. Kent presiding. The Court having carefully considered the oral testimony of all witnesses presented live at trial, the deposition transcript of each witness proffered in that format, all exhibits tendered during the course of trial, all pleadings here-

tofore filed herein particularly including the pretrial order and all relevant attachments, the opening statements of each of the parties, as offered through their respective counsel and the Proposed Findings of Fact and Conclusions of Law submitted by each of the stated parties, and on the basis of a preponderance of the evidence, and pursuant to Rule 52(a) of the Fed.R.Civ.Proc., hereby enters its FINDINGS OF FACT and CONCLUSIONS OF LAW:

## II.
### FINDINGS OF FACT

1. Plaintiff Fred Thier was injured in a one-automobile crash on June 22, 1993. The crash occurred when Mr. Thier, a Cadet assigned to the Defendants' vessel,[1] the M/V GENEVIEVE LYKES, the Chief Officer of the M/V GENEVIEVE LYKES, Robert Borzi, and Mr. Borzi's girlfriend, Catherine Carlton, were driving to a restaurant for dinner. They had just left dock where the M/V GENEVIEVE LYKES was berthed when Mr. Borzi, who was driving, lost control of the vehicle and crashed. At the time of the crash, Mr. Borzi was legally intoxicated. Mr. Borzi lost his life in the crash. Mr. Thier and Ms. Carlton sustained non-fatal injuries.

2. Plaintiff Fred Thier timely commenced this lawsuit asserting causes of action under the Jones Act and General Maritime Law for personal injuries sustained in the crash. Timely responsive pleadings were thereafter filed by defense interests, and this cause came on for non-jury trial on June 1, 1995. This Court has jurisdiction pursuant to 46 U.S.C.App. § 688, commonly referred to of the "Jones Act", Rule 9(h) of the Fed.R.Civ. Proc., 28 U.S.C. § 1333 which provides original jurisdiction over any admiralty or maritime claims, and the Admiralty Extension Act. 46 U.S.C.App. § 740. The damages sustained by Plaintiff were caused by Defendant's vessel-related negligence, notwithstanding that the damages and injuries were consummated on land. No party filed a jury

demand and the cause was tried without a jury pursuant to Rule 9(h) of the Fed.R.Civ. Proc. Venue is proper in this Court because the Defendants are subject to the personal jurisdiction of this Court, Plaintiff Fred Thier lives within the district and division of this Court, and material witnesses and evidence are closely situated to this Court such that convenience factors weigh in favor of trial in this venue.

3. The Defendants have contested Plaintiff's "seaman status" and filed a motion for summary judgment on this issue which the Court denied. After hearing all the evidence at trial and evaluating the credibility of the witnesses testifying in person at trial and carefully evaluating the deposition testimony submitted herein, the Court concludes that Plaintiff Fred Thier was a "Jones Act" seaman in service of and in the course and scope of his employment on the M/V GENEVIEVE LYKES at the time of the subject incident. Mr. Thier had an employment related connection to a vessel in navigation which was substantial in both its duration and nature, and he contributed to the function of the vessel and to the accomplishment of its mission. There was ample evidence that Mr. Thier performed significant job-related functions onboard the M/V GENEVIEVE LYKES. Mr. Thier monitored cargo operations, he presented the ship to foreign inspectors, he assisted in mooring operations, performed anchor watches, prepared the ship for receiving pilots, completed ship's papers, and numerous other tasks performed by ship's officers which are necessary for the proper operation of the ship. Mr. Thier was paid wages by the Defendants and he received all his instructions and employment related direction from employees of the Defendants. All of the tools necessary for the work performed by Mr. Thier were provided to Mr. Thier by the Defendants.

4. The Defendants contend that Mr. Thier's assignment to the vessel in question was transitory and, therefore, Mr. Thier was not an employee of the Defendants for the purposes of this suit. The Court respectfully

---

1. Mr. Thier was a United States Merchant Marine Academy cadet, temporarily assigned to the vessel pursuant to 46 C.F.R. § 310.60. He had been on the vessel six weeks. The day of the accident was to be his last on the vessel, before returning to school.

disagrees. Mr. Thier boarded the ship in Pensacola, Florida and sailed with the ship to New Orleans, Louisiana, South America, Corpus Christi, Texas, and eventually to Lake Charles, Louisiana where the subject incident occurred. This journey spanned six weeks, and except for brief shore leaves, Mr. Thier was onboard the vessel and assigned to the vessel the entire time. Mr. Thier's attachment to the M/V GENEVIEVE LYKES was no more transitory than is the connection between any "relief" seaman working out of the union hall and the vessel owner.

5. Mr. Thier was acting in the course and scope of his employment at the time of the incident. At the time of the crash, Mr. Thier was assigned to the M/V GENEVIEVE LYKES as a cadet. Cadets must receive a formal evaluation from a ship's officer before being discharged from a vessel. He had not yet been discharged from the vessel and he had not yet received his final evaluation. Indeed, he was going to dinner with the Chief Officer who was to evaluate him and he considered the dinner . to be "official" and very important to that evaluation. Still assigned to the vessel, Mr. Thier was subject to the direction and orders of the superior officers onboard. During his tenure onboard the M/V GENEVIEVE LYKES, Mr. Thier was assigned work by Chief Officer Robert Borzi. On the night of the incident, Mr. Thier was packing his gear in preparation of departing the vessel the next morning when Chief Officer Borzi entered his room and told Mr. Thier "you are going to dinner with me. Come by my room in a couple of minutes." It was Mr. Thier's understanding that during the evening Mr. Borzi was to give Mr. Thier his evaluation and finalize the requirements for Mr. Thier to depart the vessel. Another purpose for the dinner trip was the recruitment of Cadet Thier for future service in Lykes' fleet. Mr. Thier was regarded onboard the M/V GENEVIEVE LYKES as an excellent cadet and candidate for future employment with Lykes, and Lykes recruited qualified cadets as part of its normal business operations. A seaman's voyage ends when he departs the vessel for home, not when he departs the vessel for dinner and business related evaluation and recruiting the night before going home.

6. Chief Officer Robert Borzi was an employee of the Defendants acting within the course and scope of his employment at all material times. Mr. Borzi's assigned duties included being company liaison for Cadet Thier. The Captain of the M/V GENEVIEVE LYKES testified it was customary for Lykes' crews to entertain cadets for the purpose of promoting good will and recruiting the cadets into Lykes' service. This had the effect of furthering Lykes' business interests. Additionally, to complete his sea duty, Mr. Thier had to receive a final review or critique of his performance onboard the vessel. One of the purposes of Mr. Thier's accompanying Mr. Borzi and Ms. Carlton to the restaurant was so that Mr. Borzi could complete his evaluation of Mr. Thier. Finally, under the regulations applicable to cadets, Lykes was obligated to ensure that the cadets take their meals with the ship's officers. As the ship's mess was closed for the evening, Lykes was obligated to provide Mr. Thier with a meal with an officer and Lykes conveniently was discharging this obligation at the time of the crash. Additionally, pursuant to 46 C.F.R. § 310.60(d) Cadet Thier was required to take his meals with the licensed officers. As the ship's galley was closed for the evening prior to Mr. Borzi's instructions to Mr. Thier to join Mr. Borzi for dinner, Mr. Borzi was carrying out the vessel's obligation to have an officer dine with Cadet Thier at the time of the subject incident.

7. Even if Mr. Borzi was not recruiting Mr. Thier, finalizing Mr. Thier's evaluation, or carrying out the ship's obligation to have the cadets dine with officers, both men still were within the course and scope of their employment for the Defendants at the time of the crash because they were heading for shore leave. The vessel was berthed at a dock which was too far from town to walk and cabs were not readily available in the Lake Charles area. Therefore, the only viable means to leave the vessel for dinner was via a rental car. Mr. Borzi had rented a car earlier the day of the crash for this purpose. There was only one road to and from the port area and at the time of the subject crash, Mr. Borzi, Mr. Thier and Ms. Carlton were leaving the port area on this standard

route to leave the ship and go ashore. In sum, even if the subject automobile trip was merely a shore leave for personal relaxation, it still would be within the course and scope of the business of the ship because shore leave is an elemental necessity in the sailing of ships.

8. In the alternative, even if Mr. Borzi were not in the course and scope of his employment at the time of the subject incident, the Defendants still would be liable for any acts or omissions on his part because Mr. Borzi was acting as an agent of the Defendants at the time of the subject automobile crash. Lykes had undertaken an obligation to provide meals to Cadet Thier and on the date of the incident the ship's mess had closed before Mr. Thier could eat. Mr. Borzi was acting as Lykes' agent for the purpose of providing transportation to Mr. Thier for his meal. Additionally, Mr. Borzi determined that Mr. Thier should have a dinner in town on his last night onboard the vessel and this decision was made in Mr. Borzi's capacity as Lykes' liaison with Cadet Thier. In determining that a meal in town was required, Lykes assumed an obligation to provide transportation to Mr. Thier to town since the only readily available means to town was the rent car obtained by Mr. Borzi on the afternoon of the crash. Thus, even if Mr. Borzi technically was not acting within the "course and scope" of his duties as Chief Officer at the time of the crash, he certainly was acting within the scope of his duties as an agent for Lykes for the purpose of providing transportation to town for Mr. Thier.

9. The act of transporting Mr. Thier to town was an operational activity of the vessel M/V GENEVIEVE LYKES.

10. The automobile crash which forms the basis of this suit occurred on June 22, 1993, at 10:05 p.m., on West Sallier Street in Calcasieu Parish, Lake Charles, Louisiana, approximately 237 feet west of Barbe Street. The crash involved only one vehicle, a 1993 Chevrolet Corsica owned by Acadiana Auto & Truck Rental, Inc. and rented to Robert Blaire Borzi. Mr. Borzi was driving the vehicle and his girlfriend, Catherine V. Carlton was riding in the front passenger seat. Plaintiff Fred Thier was in the rear seat behind Catherine Carlton. Immediately upon leaving the dock area, West Sallier Street proceeds straight in an easterly direction with a railroad track to the South. The eastbound lane of West Sallier Street then makes a "lazy curve" to the right, across the railroad track, and then a "lazy curve" back to the left to again run parallel to the railroad track, but this time on the South side of the railroad track. On the straightaway before reaching this "lazy S curve", Robert Borzi accelerated the Corsica greatly in excess of the posted 35 mile an hour speed limit. Passenger Carlton admonished Mr. Borzi to slow down but he refused and continued eastbound at a high rate of speed. When the road curved to the right, Mr. Borzi did not and proceeded into median where he lost control of the vehicle. The vehicle flipped and became airborne, ejecting Fred Thier from the rear seat. All three occupants of the vehicle sustained serious injuries in the crash and Robert Borzi died from his injuries. No vehicles other than the Corsica were involved in the crash.

11. Fred Thier testified he saw the car's speedometer at 100 m.p.h. before the crash. The police officer who investigated after the crash testified that the physical evidence at the scene was consistent with this excessive speed. Robert Smith testified as both a fact and expert witness in accident investigation and reconstruction. The Court finds him competent to render expert opinions regarding the causes of the crash. Mr. Smith testified at length regarding the facts and dimensions of the crash scene and irrespective of Mr. Smith's opinions regarding cause, the Court concludes that the cause of the crash was excessive use of alcohol by Mr. Borzi and the resulting effect upon his ability to control the speed and direction of the vehicle. This conclusion is consistent with that of the investigating officer.

12. After Mr. Borzi was pronounced dead, he was transported to the Calcasieu Parish Coroner's office where he was examined by a Deputy Coroner, Dr. Terry Welke. Dr. Welke extracted a vitreous sample from Mr. Borzi and sent the sample to the Southwest Institute of Forensic Sciences for a blood-alcohol analysis where it was analyzed

by Dr. Elizabeth Todd. Appropriate steps were taken by Dr. Welke and the Calcasieu Parish Coroner's office and by Dr. Todd and the Southwest Institute of Forensic Sciences to ensure the chain of custody was maintained and that an untainted sample of Mr. Borzi's blood was analyzed. Dr. Todd performed a blood-alcohol content analysis on the vitreous solution using appropriate test methods based upon sound medical and scientific principles and the results of her analysis accurately reflect the vitreous alcohol content of Robert Borzi's blood at the time of the subject car crash.

13. Plaintiff presented the expert testimony of Dr. Welke by deposition and he is competent to testify in the field of toxicology related to blood alcohol levels. Dr. Welke testified that at the time of the crash, Mr. Borzi had a vitreous humor alcohol content of 0.147 and this correlates to a blood alcohol level of 0.12. The crash occurred in Louisiana, whose state law prohibits driving with a blood alcohol level of greater than 0.10.[2] To achieve a blood alcohol level of 0.12, Mr. Borzi would have had to consume approximately six (6) beers.

14. Robert Borzi's blood-alcohol content at the time of the crash exceeded the legal limit and Mr. Borzi was legally intoxicated at the time of the crash. Mr. Borzi consumed virtually all of the alcohol which led to his intoxication while aboard the M/V GENEVIEVE LYKES in violation of Lykes' policies and procedures and in violation of 33 C.F.R. § 95. On the afternoon of the crash, Robert Borzi went to pick up two rental cars with the girlfriend of the vessel's Captain, Ms. Gundrun Zimmermann. Robert Borzi and Ms. Zimmermann caught a ride with a Lykes vehicle to the rental car agency where Mr. Borzi rented a car in his name and Ms. Zimmermann rented a car in her name. Mr. Borzi was to use his car for the evening and the vessel's Captain, Mr. Pierson, was to use the other car to take Ms. Zimmermann out on the town. Ms. Zimmermann was to follow Mr. Borzi back to the vessel. On the way back to the vessel, Mr. Borzi stopped at a local bar where he had one drink. Mr. Borzi and Ms. Zimmermann also stopped at a store

where Mr. Borzi purchased items unknown to Ms. Zimmermann, but which were brought back to the vessel in a paper bag. Mr. Borzi and Ms. Zimmermann returned to the vessel sometime before 6:00 p.m. on the day of the incident and at the time of their return to the vessel, Mr. Borzi was not intoxicated. There was no evidence that Mr. Borzi ever left the vessel before departing for the restaurant and there was ample evidence from the testimony of Mr. Thier and Ms. Carlton that Mr. Borzi was drinking on the vessel before leaving for the restaurant. While on the vessel between 6:00 p.m. and 10:00 p.m. on June 22, 1993, Mr. Borzi consumed the alcohol which caused his intoxication which resulted in the crash.

15. The Defendants had clearly posted policies and procedures which prohibited any crew member, including the vessel's Captain and other officers, from bringing alcohol onboard the vessel. Moreover, the Shipping Articles for the subject voyage signed by each crew member and officer clearly prohibited the vessel's crew, including its Captain and officers, from bringing alcoholic beverages onboard the ship. United States Coast Guard regulations also govern the use of alcohol onboard a commercial vessel. The M/V GENEVIEVE LYKES was a commercial vessel within the meaning of subchapter F of 33 C.F.R., 33 C.F.R. § 95.001–055. The M/V GENEVIEVE LYKES was a vessel inspected or subject to inspection under chapter 33 of Title 46 of the United States Code and Robert Borzi was a crew member of the vessel. Coast Guard regulations prohibit a crew member onboard the M/V GENEVIEVE LYKES from being intoxicated at any time. 33 C.F.R. § 95.045. The Coast Guard regulations also require the marine employer to exercise due diligence to ensure compliance with the applicable provisions of subchapter F.

16. Robert Borzi violated 33 C.F.R. § 95.045 because he was intoxicated onboard the M/V GENEVIEVE LYKES prior to departing for the automobile trip which resulted in his death. Immediately before departing for the automobile trip, Mr. Borzi was

2. The same prohibition exists under Texas Law.

operating a vessel while intoxicated within the terms of 33 C.F.R. § 95.015 and § 95.020. The Defendants violated 33 C.F.R. § 95.050 by failing to exercise due diligence to ensure that no member of the crew violated 33 C.F.R. § 95.045 and § 95.020. These statutes and regulations are safety regulations designed to protect persons in Plaintiff's class from the very type of incident which injured Plaintiff.

17. Not only did the Defendants fail to exercise due diligence to prohibit drinking onboard the vessel, the Defendants essentially operated a "floating dram shop" in violation of the Coast Guard regulations and their own policies. The Defendants' corporate representative unequivocally testified on behalf of the corporation that Lykes does not purchase alcohol for crew, although such beverages are provided for the passengers. The Plaintiff introduced numerous supply requisitions indicating that ample party supplies were purchased for the M/V GENEVIEVE LYKES and delivered to the M/V GENEVIEVE LYKES including:

a. on June 14, 1995, two fifths of Jim Beam, two fifths of Scotch, two fifths of Vodka, three cases of Budweiser, six bottles of champagne and assorted sodas and party snacks;

b. on October 20, 1993, two fifths of Jim Beam, two fifths of Vodka, three cases of Budweiser, six bottles of champagne and again various sodas and party snacks; and,

c. this same list of alcohol was purchased for the vessel again on April 28, 1993, March 8, 1993 (except that only two bottles of champagne were ordered this time), December 3, 1992 (except that the order was cut down to one bottle of Jim Beam, one bottle of Vodka and three bottles of champagne) and October 14, 1992.

Additionally, despite denials by Captain Pierson, the master of the M/V GENEVIEVE LYKES, the credible evidence established that drinking took place onboard the vessel while it was at port at Corpus Christi, Texas on the port call immediately prior to the port call at Lake Charles where the crash occurred, including both passengers *and* crew. The captain himself even maintained a liquor cabinet onboard the vessel out of which he had secured drinks for himself and his girlfriend while the Captain was on duty at Corpus Christi, Texas on the previous port call.

18. Robert Borzi was negligent in consuming excessive amounts of alcohol while operating a commercial vessel in violation of 33 C.F.R. subchapter F. Robert Borzi was negligent in operating a motor vehicle in excess of the posted speed limit of 35 miles per hour. Robert Borzi was negligent in operating a motor vehicle while intoxicated. Robert Borzi was negligent in failing to maintain proper control of his vehicle when attempting to negotiate a shallow right-hand turn. All these acts and omissions were producing and proximate causes of the injuries and damages sustained by Plaintiff Fred Thier as found hereinbelow, and the Defendants are liable for these acts and omissions on the part of Mr. Borzi.

19. The Defendants were negligent in failing to enforce their own policies and procedures regarding the bringing of alcohol onboard the M/V GENEVIEVE LYKES, the consumption of alcohol onboard the M/V GENEVIEVE LYKES, and the operation of the vessel by persons who are intoxicated. The Defendants were negligent in failing to use due diligence to ensure no intoxicated crew members were onboard the vessel in violation of subchapter F of 33 C.F.R. The Defendants were negligent in operating a "floating dram shop" and allowing a party atmosphere to prevail onboard wherein ship's officers frequently had girlfriends and guests onboard together with a regularly stocked store of party supplies including alcoholic beverages.

The Defendants were negligent in failing to take proper steps to ensure intoxicated employees did not drive automobiles and they were negligent in entrusting Mr. Thier to Mr. Borzi, while he operated a rental car in an intoxicated condition. These acts and omissions on the part of the Defendants were producing and proximate causes of the damages sustained by Plaintiff Fred Thier as found hereinbelow.

20. Plaintiff Fred Thier was not contributorily negligent and no act or omission on his part caused or contributed to any of his damages. Plaintiff Fred Thier has adequately mitigated all of his damages.

21. No fault on the part of the Port of Lake Charles and the City of Lake Charles based upon improper design and signage of the roadway in question was a proximate or producing cause of Plaintiff's damages. The floating dram shop, M/V GENEVIEVE LYKES, was not necessarily unseaworthy because of the consumption of alcohol onboard. It could have been rendered reasonably fit for its intended purposes through the use of reasonable care by the Defendants. No unseaworthiness on the part of the vessel was a cause of Plaintiff's damages.

22. Following the crash, Plaintiff Fred Thier was found outside the vehicle in a sitting position in the middle of the roadway. He was in a state of shock and only semiconscious. Mr. Thier immediately was taken to the Lake Charles Memorial Hospital where he received emergency care. Mr. Thier was diagnosed with a basilar skull fracture which resulted in a pneumocephalus, air leaking into his brain. Mr. Thier also sustained a laforte 2 facial fracture which essentially means that the bones holding his face in place were crushed, breaking his face plate free. This had to be surgically repaired and involved the insertion of steel plates under Mr. Thier's eyes to hold his face in place. Upon release from the Lake Charles Memorial Hospital, Mr. Thier received follow-up care at John Sealy Hospital in Galveston, Texas. Mr. Thier continued to complain of pain, and of soreness in his back and shoulder. These complaints essentially have resolved, although Mr. Thier still experiences soreness from time to time.

23. Mr. Thier's most serious injuries related to the crash stem from the closed head injury he sustained. Mr. Thier was examined and subjected to neuropsychological testing by Dr. Nancy Leslie. This testing revealed that Mr. Thier's performance I.Q. is 125 which is in the superior range, but his verbal I.Q. is now 94. Absent some major trauma, verbal and performance I.Q. scores should roughly be equal. Dr. Leslie testified that the difference between the performance and verbal I.Q. scores, based upon reasonable medical probability, was caused by the injuries sustained in the crash. Dr. Leslie testified that Mr. Thier's overall I.Q. was decreased by approximately 15 points as a result of the subject incident.

24. Mr. Thier was also examined by Catherine Bontke, a specialist in physical medicine and by Dr. Thomas A. Blackwell, and their opinions were consistent with Dr. Leslie's in that the head injuries sustained by Mr. Thier caused his 30 point differential between performance I.Q. and verbal I.Q., and an overall I.Q. loss of approximately 15 points.

25. Also as a result of his head injury, Mr. Thier sustained damage to the part of the brain which controls his visual field on the right of his gaze. Accordingly, Mr. Thier has an uncorrectable "hole" or dark spot in the right field of his vision. Mr. Thier was examined by Dr. Thomas Blackwell, a specialist in emergency medicine and internal medicine who testified that the left side of the brain controls the vision for the right side of a person's gaze and that the left side of the brain also controls one's speech. Accordingly, Mr. Thier's reports of loss of memory shortly after the crash, right visual field deficit, and his loss in verbal I.Q. all are consistent with a left-sided brain injury.

26. The Defendants presented testimony through their referral expert, Dr. John Cassidy. Dr. Cassidy disagreed with the evaluations of Dr. Leslie, Dr. Bontke and Dr. Blackwell regarding Mr. Thier's loss of I.Q. as a result of the head injuries sustained in the crash. Dr. Cassidy readily acknowledges that Mr. Thier sustained a mild traumatic brain injury in the crash, but he hotly disputes the conclusions of Drs. Leslie, Bontke and Blackwell that Mr. Thier sustained a focal left hemispheric brain injury resulting in any disfunction. The testimony of Dr. Cassidy is of dubious credibility and the Court accepts the testimony of Drs. Leslie, Bontke and Blackwell regarding Mr. Thier's injuries and damages sustained in this crash. Dr. Cassidy testified that he saw 3000 patients last year and this Court is unable to fathom how any physician could provide

meaningful treatment to any individuals in such a crowd. Dr. Cassidy's evaluation of Mr. Thier was based upon a brief examination of Mr. Thier and a review of medical records which quite obviously were so focused against Mr. Thier's positions in this lawsuit that Dr. Cassidy appeared more as an advocate than as an independent evaluator. Dr. Cassidy has no explanation for Mr. Thier's vision difficulties and Dr. Cassidy focused upon one SAT test taken by Mr. Thier prior to the subject incident in determining that Mr. Thier sustained no decrease in verbal I.Q. as a result of the incident. Dr. Cassidy completely ignored a subsequent SAT test, also taken before the subject crash, which indicated Mr. Thier's verbal I.Q. could be in a range consistent with his performance I.Q. In summary, the Court respectfully rejects the testimony of Dr. John W. Cassidy regarding the injuries and damages sustained by Mr. Thier in its entirety, and accepts the testimony of Drs. Nancy Leslie, Catherine Bontke, and Thomas A. Blackwell.

27. Based upon the credible medical testimony and medical records, Mr. Thier sustained a closed head injury and a loss in his overall I.Q. which has diminished his ability to communicate and his ability to understand and follow instructions. This decrease in I.Q. also has made it much more difficult for Mr. Thier to perform higher level cognitive functions and he now is required to expend substantially more effort to perform tasks which previously required less effort. Mr. Thier will be able to graduate from the Merchant Marine Academy at Kingspoint but he will have to expend substantially more effort to do so.

28. Mr. Thier comes from a maritime family and has been working his entire life toward a career as a blue water marine officer. Prior to the subject incident, Mr. Thier was evaluated by Lykes as an excellent cadet and apparently was able to perform all his required functions well. Mr. Thier's evaluations for shipboard training after the subject crash reflect his difficulty in understanding and carrying out orders consistent with his impaired verbal I.Q. as a result of the subject incident. The maritime industry is competitive and only approximately 4% of the Merchant Marine Academy graduates go on to officer's duties in the Merchant Marine. If Mr. Thier had not sustained the head injuries in the subject incident, more likely than not, he would have gone on to a career as a blue water ship's officer. Due to his head injuries and attendant I.Q. deficit and vision problems, more likely than not, Mr. Thier will not be able to graduate to a career as a ship's officer in the Merchant Marine.

29. The Court found Mr. Thier to be a pleasant, honest, straightforward and credible witness. He is exceedingly polite and deferential to authority and he was honest and diligent in attempting to respond to questions by counsel and the Court. The Court notes, however, that Mr. Thier has a great deal of difficulty orally expressing himself and focusing his attention sufficiently to respond even to simply worded straight forward questions. Through extra effort and sheer force of will, Mr. Thier now can slowly work through problems which prior to the subject incident he could quickly and easily resolve. The realities of today's marine environment will not permit Mr. Thier the additional time he requires to perform the higher level mental functions necessary to run a ship. Today's ship's officer must handle complicated navigational equipment, communications equipment, weather gathering equipment, cargo planning equipment, and numerous other sophisticated tools which demand precision and accuracy the first time. Errors in their operation may result in a shipping disaster on the magnitude of the Exxon Valdez or the Amoco Cadiz. Based upon this Court's observations of Mr. Thier and the testimony of his physicians, the Court concludes that Mr. Thier will not be able to sustain a career as a ship's officer in the Merchant Marine.

30. The Court concludes, however, that Mr. Thier is certainly employable and that he will be able to maintain relatively steady employment throughout the remainder of his life. The economic value of this alternative employment is difficult to evaluate with precision. Were Mr. Thier relegated to relatively menial unskilled labor, his residual earning capacity would be at the current minimum wage of $4.25 per hour. The Defendants

presented testimony through their expert economist, Mr. Ken McCoin, that the average hourly wage of all workers in America is approximately $12.00 per hour. This figure takes into account multi-millionaire entrepreneurs, highly educated Ph.D.'s and professionals, as well as all manual laborers. Mr. Thier's chosen profession was that of a ship's officer and he now will have to perform outside his area of training. More likely than not, Mr. Thier will not keep up with the nation's average in earnings, but he will be able to earn more than minimum wage. The Court finds Mr. Thier's residual earning capacity to be $7.00 per hour.

31. Plaintiff presented at trial Dr. Thomas Mayor as his economist. Dr. Mayor received his Ph.D. from the University of Maryland in 1965 in economics and has been employed the last twenty years as a professor of economics at the University of Houston. Dr. Mayor examined the Plaintiff's employment records, income tax return, social security administration earnings' records, school records, wage rates of ship's officers employed by Lykes, expert testimony of Plaintiff's testifying liability expert, Joe Grace (a former Lykes vessel captain), and other relevant information and arrived at an estimate of Mr. Thier's economic losses.

32. The calculation of economic damages generally begins with examination of a claimant's earnings history, but that is not possible in this case since Mr. Thier still was completing his education to enable him to embark on a career in the marine industry and his past earnings are not an accurate, reliable, or realistic basis for determining his true pre-crash earning capacity. A more reasonable starting point would be the estimated career earnings of a competent Merchant Marine officer, which the Court finds Mr. Thier would have been had the subject crash not occurred. The Plaintiff introduced evidence of wages for sea officers employed by the Defendants from 1990 through 1994, and the Court accepts these wages as standard in the industry for persons working their way up the command chain from Third Mate to Second Mate to Chief Mate to Captain. The inquiry does not end there, however, because the evidence introduced only provides daily wage rates for the various officers. Plaintiff introduced evidence of the number of days worked by the average maritime worker through Plaintiff's expert, Joe Grace. Captain Grace is a former Lykes Master and he based his testimony in this area upon conversations he had with representatives of the union which services officers in the Merchant Marine. Based upon Captain Grace's estimates of the numbers of days worked and the economic projections of Dr. Mayor discussed below, Dr. Mayor estimated a total earning capacity to retirement age 58.8 years in the amount of $3,701,254.00. Captain Grace's estimates of the numbers of days worked for ships officers in the current climate are reasonable and supported by credible evidence. Nevertheless, the Court concludes that these figures present a "best case scenario" and given the uncertainties about Mr. Thier's probable career, the Court concludes it is not reasonable to base Mr. Thier's economic loss determination upon this best case scenario. Therefore, the Court asked the economists to assume lower numbers for number of days worked based upon ships officers who work only one-half of the year or less and that the time to rise through the ranks to Captain would be much longer than the time estimated by Captain Grace. The economists accordingly performed the calculations based upon the following projected career path for Mr. Thier:

1. Upon graduation from Kingspoint Merchant Marine Academy and obtaining employment as a ship's officer beginning January 1, 1996, Mr. Thier would work three years as a relief Third Officer at $123.20 per day working 120 days per year;

2. Mr. Thier then would have been promoted to full-time Third Officer for four years at $123.20 per day working 180 days per year;

3. Mr. Thier then would have been promoted to Second Officer for five years at $137.10 per day working 180 days per year;

4. Mr. Thier then would have been promoted to Chief Officer for eight years working at $150.99 per day, 180 days per year;

5. Mr. Thier then would have been promoted to relief Captain for two years at $338.93 per day working 120 days per year; and,

6. The remainder of Mr. Thier's work life would have been as a full-time Captain at $338.93 per day working 180 days per year.

33. These projected wage rates are in today's dollars and Dr. Mayor testified that the growth rate of these earnings would be approximately 1.25% per year based upon historic growth rates. The Court finds this growth rate assumption to be reasonable and adopts it.

34. The Court finds the career projections in the second to last paragraph above to be reasonable and supported by the evidence. The evidence submitted by Plaintiff supports a higher average number of days per year worked and a more aggressive career promotion path and the Court concludes that the evidence submitted by Plaintiff is credible and sufficient to support total lost future earnings capacity in the amount of $3,701,-254.00. Nevertheless, given the uncertainties associated with anyone's career, the Court adopts the lower career estimates indicated in the second to last paragraph above. The Defendants presented as their expert economist, Dr. Kenneth McCoin, who is well known to and highly respected by this Court and frequently testifies regarding economic issues in civil litigation. Dr. McCoin obtained his Ph.D. from The University of Houston where he studied economics under the Plaintiff's economist, Dr. Thomas Mayor. The Court questioned Dr. McCoin regarding the reasonableness of the career assumptions described above and Dr. McCoin, the Defendants' economist, agreed that the estimates are reasonable and supported by the realities in the industry and Dr. McCoin even expressed surprise at how close these estimates were to the estimates Dr. McCoin himself intended to utilize based upon his own experience and expertise. Accordingly, the Court adopts the foregoing career projections as a reasonable and credible basis to evaluate Mr. Thier's economic damages.

35. Mr. Thier's date of birth is February 25, 1972. The Plaintiff contends that Mr. Thier's work life should be projected to age 65 given the Social Security retirement age and given Mr. Thier's professed life long desire to sail as a ship's officer. The Plaintiff's economist, utilizing government tables, testified that the median retirement age for one similarly situated to Mr. Thier would be at age 62.7, and that the mean retirement age based upon government work life tables would be to age 58.8. Again, utilizing the lower of these estimates, the Court finds that Mr. Thier would have retired at age 58.8 and so bases its economic calculations.

36. The income streams generated by the foregoing income projections must be discounted in accordance with *Culver II*. In accordance with *Culver II*, the Court must adopt a pre-tax after inflation discount rate at which the income stream should be discounted to arrive at the present value of the economic losses. Dr. Mayor testified that utilizing a forty year history, (1947–1993), inflation rates and interest rates on safe investments, a pre-tax discount rate of 1.0% per year would be appropriate. Utilizing a shorter period of twenty years, (1970–1993), to evaluate these same indicators, Dr. Mayor testified an appropriate discount rate would be 1.5% per year. The Court finds that a mid-point of the two periods is an appropriate discount rate which is supported by the evidence and, accordingly, adopts a pre-tax discount rate of 1.25% to determine the present value of Mr. Thier's economic losses. In accordance with *Culver II*, this pre-tax rate must be adjusted for the effects of taxes and Dr. Mayor testified that after adjusting for the effects of income taxes, the appropriate after-tax discount rate is 0.75%. The Court recognizes that the United States Court of Appeals for the Fifth Circuit, in the *Culver II* decision, specified that this Court must identify a pre-tax discount rate and that if the rate is between 1% and 3% it will be accorded "great deference" so long as it is explained. This Court therefore respectfully adopts a pre-tax discount rate of 1.25% per year in accordance with *Culver II* for the reasons set forth above.

37. The Plaintiff's expert, Captain Joe Grace, testified that ship's officers typically receive overtime and vacation pay in addition

to their normal pay. The Plaintiff's economist estimates the value of this overtime and vacation pay to be an additional 40% above the pay obtained for actual days worked. The Court accepts this testimony as credible and supported by the evidence and accordingly increases the income streams by an additional 40% to allow for overtime and vacation pay.

38. In addition to pay, overtime, and vacations, Mr. Thier would have been entitled to fringe benefits which included a maritime pension and a medical benefits plan. The Court finds that the value of the maritime pension would be approximately 15% of gross wages and the value of the medical plan would be approximately $100.00 per month. The Court finds that these are valid components of Mr. Thier's economic losses and they are supported by the evidence and, accordingly, adopts them.

39. In addition to the other benefits associated with employment, Mr. Thier would have received room and board during the time he was working on the vessels. Dr. Mayor estimated the value of this room and board at $9.00 per day. The Court finds this estimation to be somewhat low, but supported by the evidence, and accepts it.

40. The foregoing income streams must be reduced to account for the effect of taxes and job expenses. Plaintiff's economist Mayor testified that expenses associated with employment would average approximately $1,000.00 per year and the Court finds this estimate to be acceptable, and supported by the evidence. Mr. Thier's gross wages also must be reduced for the effects of payroll taxes and federal income taxes and the Court finds these deductions were appropriately made by Dr. Mayor in arriving at his lost earning capacity estimates. The payroll tax deduction from gross wages ranged from $1,583.00 for a Third Officer working 120 days per year, to $5,146.00 for a Captain working 180 days per year. The federal income tax deduction from gross wages ranged from $2,164.00 for a Third Mate working 120 days per year, to $19,134.00 for a ship's Captain working 180 days per year. These taxes were calculated by Dr. Mayor utilizing current tax tables and standard deductions with a single exemption. The Court finds these deductions appropriate and accepts them.

41. Based upon the foregoing assumptions, Dr. Mayor testified that the discounted present value of Mr. Thier's projected after tax income stream would be $1,929,546.00. The Court finds the foregoing assumptions to be supported by the evidence and credible and the Court finds that Dr. Mayor's calculations were properly performed and accepts this calculation as an appropriate estimate of Mr. Thier's economic earning capacity had he not been injured.

42. The Court finds that Mr. Thier's injury will prevent him from completing the career path indicated in the foregoing assumptions. The Court finds that Mr. Thier is not totally disabled, however, and that he will hold gainful employment for the remainder of his life. The Court has found that Mr. Thier's residual earning capacity is $7.00 per hour. Plaintiff's economist, Dr. Mayor, testified that assuming Mr. Thier worked 40 hours per week, 52 weeks per year at $7.00 per hour, and further assuming that this $7.00 per hour would have fringe benefits worth 16.6% of gross wages (this 16.6% figure is derived from the assumptions used by the Defendants' economist, Dr. McCoin), Mr. Thier's residual earning capacity discounted to present value utilizing the same assumptions adopted above would be $508,116.00. The Court finds these assumptions to be supported by the evidence and appropriate and accordingly accepts them.

43. Subtracting the Plaintiff's residual earning capacity from his pre-injury earning capacity, the Court finds Mr. Thier can clearly and fairly argue sustained economic damages in the amount of $1,421,430.00. However, to be scrupulously fair, the Court notes its apprehension about accurately projecting a life-time of earnings and benefits for someone of tender age and indeed still in school. It is entirely possible that Mr. Thier might have left marine employment at some time, or that his career track would be slower than that of others. Therefore, taking into consideration the broad range of loss arguable by both sides, the Court finds Plaintiff's total future economic loss to be $710,715.00, or

one-half the loss he actually proved through credible witnesses and evidence in the trial of this case.

44. Mr. Thier has incurred past medical expenses in the amount of $26,142.01, which are reasonable and made necessary as a result of the subject crash, and he is entitled to recover this amount from the Defendants.

45. Mr. Thier was examined by an internal medicine specialist, Dr. Thomas Blackwell, who testified that future medical expenses in the range of $3,000–$5,000 for surgery would be incurred to remove the steel plates which were installed to hold his face in place. The Court concludes that the mid-range of these figures is an appropriate estimate of Mr. Thier's future medical expenses and finds that such expenses will be $4,000. Additionally, Dr. Bontke testified that Mr. Thier will need psychological counseling and driving therapy which, over Mr. Thier's lifetime will cost $24,560. Dr. Bontke also testified that Mr. Thier should expect costs of $1,500.00 for future cosmetic surgery and that $50,000.00 should be set aside to cover future medical expenses resulting from the crash, including further facial or brain surgery. The Court accepts these future medical expenses as reasonable and necessary as a result of the crash and finds that Mr. Thier should receive a total of $80,060.00 for reasonable and necessary future medical expenses as a result of the crash.

46. Finally, the Court addresses the Plaintiff's subjective losses. Plaintiff was involved in a horrible automobile crash which resulted in the death of his friend and co-worker, major facial and head trauma to the Plaintiff, a significant loss in verbal IQ, serious and obvious scarring to Plaintiff's face under his eyes, air seeping into Plaintiff's brain, reduction in visual field, and other difficulties involving Plaintiff's eyes, serious psychological problems dealing with his injuries, and intellectual difficulties, and problems dealing with larger questions of why his friend died while he lives. The Court observed Mr. Thier at trial and noted his obviously depressed and exceedingly serious demeanor. The Court observed first hand the scarring to Mr. Thier's face which the Court finds particularly significant to a young man

of Plaintiff's age and station in life. Mr. Thier faces a future surgery to remove the steel currently imbedded in his facial bones and this logically will not help the scarring to Mr. Thier's face. The psychological and intellectual injuries sustained by Mr. Thier will continue for the remainder of his life and the disfigurement likewise will continue for the remainder of Plaintiff's life. On the totality of the evidence offered in this case, and after careful consideration of the relevant testimony of each of the presented witnesses, and the records produced at trial, the Court finds that a fair and reasonable amount to compensate the Plaintiff's past pain and suffering, mental anguish, physical infirmity and disfigurement, equals $300,000.00. The Court also finds that an amount of $200,000.00 is fair and reasonable to compensate the subjective losses the Plaintiff will suffer throughout the remainder of his natural life. Consequently, the Court finds that Plaintiff's combined past and future subjective losses should be compensated in the total amount of $500,000.00.

47. The Court finds that Plaintiff is entitled to pre-judgment interest, at a rate of 5.88% per annum, relative to the subjective losses and actual losses he has sustained to date. Totaling Plaintiff's past subjective losses of $300,000.00 and his past medical expenses of $26,142.01 from the date of crash to the date of Judgment, September 14, 1995, the Court finds that the interest due and owing on such amount equals $42,189.73. The Court finds that the Plaintiff shall also have post-judgment interest on the full amount of the judgment, until the payment in full of such outstanding judgment, also at the rate of 5.88% per annum.

48. In consequence of all the foregoing, the Court finds that Plaintiff has sustained total damages of:

| | | |
|---|---|---|
| a. | Future economic losses | $ 710,715.00 |
| b. | Past subjective losses | $ 300,000.00 |
| c. | Future subjective losses | $ 200,000.00 |
| d. | Past medical expenses | $ 26,142.01 |
| e. | Future medical expenses | $ 80,060.00 |
| f. | Pre-judgment interest | $ 42,189.73 |
| | Total Damages | $1,359,106.74 |

Defendants are jointly and severally one hundred percent (100%) negligent in this case and this negligence was a legal cause of Plaintiff's damages, and the Court finds no

negligence on the part of the Plaintiff. Consequently, the Court finds the Plaintiff is entitled to and shall have and recover of and from the Defendants the stated amount of $1,359,106.74, together with interest thereon at the rate of 5.88% per annum, from the date of Judgment, until the satisfaction thereof, as well as taxable costs of court, as provided by law.

## CONCLUSIONS OF LAW

■ 1. At the time of his injury on June 22, 1993, Plaintiff Fred Thier was a "seaman" as that term is defined in law. 46 U.S.C.App. § 688. During Mr. Thier's entire employment with Lykes, he was assigned to the Lykes vessel, M/V GENEVIEVE LYKES, and Mr. Thier worked as a crew member performing numerous officer's duties for the benefit of the vessel and he contributed to the mission of the vessel. Mr. Thier was paid by the Defendants for his services and his pay was reasonable given his experience and responsibilities. Prior to his assignment to the M/V GENEVIEVE LYKES, Mr. Thier was not an "employee" of anyone. Even if he were considered to be an employee of the United States government while studying at Kingspoint Merchant Marine, his work assignment clearly changed when he was hired by Lykes as a cadet and assigned to the M/V GENEVIEVE LYKES. Without question, Mr. Thier would not be considered a "seaman" and entitled to the protection of the Jones Act if he were injured while walking the hallways of the Kingspoint Marine Academy during the course of his regular semester studies there. Nevertheless, "[w]hen a maritime worker's basic assignment changes, his seamen's status changes as well." *Chandris, Inc. v. Latsis,* — U.S. —, —–—, 115 S.Ct. 2172, 2191–92, 132 L.Ed.2d 314 (1995). As the U.S. Supreme Court recently recognized in this decision:

> [W]e can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman's status if injured shortly after the reassignment, just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman's status on the basis of prior service at sea. If a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position.

After carefully considering the facts presented at trial and thorough review of the documents filed with the Court, the Court concludes that at the time of the subject incident, Mr. Thier's duties contributed to the function of the vessel or to the accomplishment of its mission and that Mr. Thier had a connection to a vessel in navigation that was substantial in both its duration and its nature. Nevertheless, even viewing all the evidence in a light most favorable to the Defendants and construing any disputed evidence in favor of the Defendants' position regarding seaman's status, the Court still concludes that, at minimum, Mr. Thier had received a new work assignment for Lykes in which his essential duties had changed and Mr. Thier is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities while working as a cadet for Lykes onboard the M/V GENEVIEVE LYKES. Whether there was permanent assignment during tenure with Lykes, reassignment to new position, or assignment to traditional seaman's duties for significant duration, Mr. Thier was a seaman and his employer was Lykes. Examining Mr. Thier's vessel-related work in this light, the Court concludes that Mr. Thier was a Jones Act seaman. *Chandris,* — U.S. —, 115 S.Ct. 2172, 132 L.Ed.2d 314.

2. The driver of the vehicle at the time of the subject crash was Robert Borzi, who was the Chief Officer of the M/V GENEVIEVE LYKES. Mr. Borzi also was a Jones Act seaman on the date of the incident in question. *Id.*

■ 3. The Court next must determine whether the Plaintiff and Mr. Borzi were acting within the course and scope of their

employment at the time of the crash. The Court notes initially that the test for whether an employee is within the "course and scope" of his employment for the purposes of the Jones Act is the same as the test for whether the employee is "in the service of the ship" for the purposes of maintenance and cure. *Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129, 132–33, 80 S.Ct. 247, 249–50, 4 L.Ed.2d 191 (1959). Accordingly, cases determining whether an employee is in the service of the ship for maintenance and cure purposes are binding precedent on this issue. It cannot be disputed that Mr. Borzi, Mr. Thier, and Mr. Borzi's girlfriend were traveling from the ship to a restaurant in the only means of transportation on the only route available and they had just left the dock area at the time of the crash. Even in the absence of any other vessel related purposes for the trip, the two men were, at minimum, headed for shore leave at the time of the crash. As such, Mr. Thier and Mr. Borzi were within the course and scope of their employment. *Aguilar v. Standard Oil Co. of NJ*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943); *Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959); *Daughenbaugh v. Bethlehem Steel Corp.*, 891 F.2d 1199 (6th Cir.1989); *Central Gulf Steamship Corp. v. Sambula*, 405 F.2d 291 (5th Cir.1968); *Allan v. Brown & Root Inc.*, 491 F.Supp. 398 (S.D.Tex.1980).

4. As noted in this Court's Findings of Fact, however there was substantially more vessel-related activity anticipated on the night of the crash and this was not a typical shore leave for purely recreational purposes. In these circumstances, both Mr. Their and Mr. Borzi were acting within the course and scope of their employment. 46 U.S.C.App. § 688.

5. The Court also concludes that even if Mr. Thier and Mr. Borzi were not acting within the course and scope of their employments as Jones Act seamen at the time of the crash, then Mr. Borzi was acting as Lykes' agent for the purpose of providing transportation to Mr. Thier and, accordingly, Lykes is liable for any negligence on the part of Mr. Borzi under the doctrine of respondeat superior. Lykes was obligated to provide Mr. Thier with meals and the ship's mess had closed. Accordingly, Lykes had to get Mr. Thier to town and taxis were not readily available for this purpose. Lykes utilized Mr. Borzi as its agent to provide transportation to Mr. Thier and is liable for the negligence of its agent. *Hopson v. Texaco*, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966).

6. The Court notes that, at least in the Joint Pretrial Order, the Defendants have challenged the subject matter jurisdiction of this Court. The Court rejects this challenge, if any, and finds that it has jurisdiction under Fed.R.Civ.Proc. 9(h), 28 U.S.C. § 1333, and the Admiralty Extension Act, 46 U.S.C.App. § 740. The Admiralty Extension Act provides that "[t]he Admiralty and Maritime jurisdiction ... shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, not withstanding that such damage or injury be done or consummated on land." The Court has concluded that negligence on the part of Lykes and Mr. Borzi occurred onboard the vessel and it cannot be disputed that this vessel negligence caused damage and injury to be done or consummated on land. Accordingly, this Court has subject matter jurisdiction irrespective of whether either the Plaintiff or Mr. Borzi were within the course and scope of their employment and irrespective of whether they were Jones Act seamen. *Duluth Superior Excursions, Inc. v. Makela*, 623 F.2d 1251 (8th Cir.1980) (passenger on a vessel was injured when struck by an automobile on a street adjoining a dock as a result of the ship's failure to provide a safe means of exit, an Admiralty jurisdiction was found).

7. Mr. Borzi was negligent and his negligence in becoming intoxicated on the vessel was a proximate and producing cause of Plaintiff's damages. The Defendants are liable for the negligence of Mr. Borzi. The Defendants were negligent per se and negligent for violating statutes designed to prevent injuries to persons in Plaintiff's class, they were negligent in operating a floating dram shop with insufficient supervision to prevent Mr. Borzi from becoming intoxicated while on the vessel, and this negligence was a proximate and producing cause of Plaintiff's damages. *Reyes v. Vantage Steamship Co., Inc.*, 609 F.2d 140 (1980) (on petition for rehearing). This Court takes judicial notice that Louisiana's traffic laws prohibit driving

with a blood alcohol content in excess of 0.10 and, accordingly, Mr. Borzi was legally drunk at the time of the subject crash. *Id.* at 140, n. 1. Mr. Borzi's negligence in becoming drunk while onboard the vessel and in failing to control the speed of his vehicle was a proximate and producing cause of Plaintiff's damages. The Defendants were negligent in failing to monitor alcohol consumption onboard, fostering a party atmosphere, and failing to prohibit drunk officers from driving and this negligence was a legal and factual cause of Plaintiff's injuries. Consequently, irrespective of whether Mr. Thier, Mr. Borzi, or both of them were Jones Act seamen or in the course and scope of their employment for Defendants at the time of the crash, Defendants are completely liable, jointly and severally, to Plaintiff for his damages sustained as a result of the subject incident, including loss of future earning capacity, reasonable costs of medical and hospital care in the future, physical pain and suffering including physical disability, impairment, inconvenience, the effects of Plaintiff's injuries on the normal pursuits and pleasures of life, and mental anguish, both past and future. See *Williams v. Chevron*, 875 F.2d 501, 506 (5th Cir.1989). The future losses must be discounted. *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir.1983). Future lost income must also reflect a judgment to net, after tax value. *Norfolk and W. Ry. v. Liepelt*, 444 U.S. 490, 493–94, 100 S.Ct. 755, 757–58, 62 L.Ed.2d 689 (1980).

8. This was an Admiralty action tried without a jury, pursuant to the Court's admiralty jurisdiction invoked by Fed.R.Civ.Proc. 9(h). Accordingly, an award of interest is proper in the sound discretion of the Court. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir.1986). The Court finds that an award of prejudgment interest is proper in this case at the rate of 5.88% per annum, on Plaintiff's past damages as provided and described in the Court's Findings of Fact.

9. On the basis of the foregoing Findings of Fact, Plaintiff has sustained damages in the amount of $1,359,106.74, inclusive of all past and future losses, prejudgment interest on past losses, together with interest on the entire Judgment, until satisfied, at 5.88% per annum.

10. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

IT IS SO ORDERED.

### FINAL JUDGMENT

For the reasons set out in the Court's Findings of Fact and Conclusions of Law, entered this date in the instant cause, and pursuant to Rule 58 of the Fed.R.Civ.P., Judgment is hereby rendered in favor of Plaintiff, on his claims of negligence. Pursuant hereto, Plaintiff Fred Thier shall have and recover of and from Defendants Lykes Bros., Inc. and Lykes Bros. Steamship Co., Inc., jointly and severally, the total amount of $1,359,106.74, together with his taxable costs of court, and post-Judgment interest at the rate of 5.88 percent paid per annum, for which let execution issue, if not timely paid.

ALL RELIEF NOT HEREIN EXPRESSLY GRANTED IS DENIED.

**THIS IS A FINAL JUDGMENT.**