**Dewey A. PALMER, as Administrator of the Estate of Dewey Shane Palmer, Deceased, et al., Plaintiffs,**

v.

**RIBAX, INC., a dissolved Florida Corporation, et al., Defendants.**

**No. 74–134–Orl–Civ–R.**

United States District Court,
M. D. Florida,
Orlando Division.

Jan. 23, 1976.

---

7. There is no basis for diversity jurisdiction between Bio-Medical and any of the defendants.

Richard W. Bates, Charles L. Steinberg, Orlando, Fla., for plaintiffs.

Terrell Griffin, Orlando, Fla., for Baxters and Ribax.

W. David Rogers, Jr., of Gurney, Gurney & Handley, P. A., Orlando, Fla., Norman J. Smith, of Brinson & Smith, Kissimmee, Fla., for defendants Riggs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REED, District Judge.

Based on evidence presented at the final evidentiary hearing in this cause on 8 December 1975, the Court makes the following:

*Findings of Fact*

1. The plaintiffs in this action are Dewey A. Palmer and his wife Roberta. The couple sues individually to recover for the wrongful death of their son, Dewey Shane Palmer. Mr. Palmer also claims in his capacity as the administrator of his son's estate. The plaintiffs' son died in the early hours of 16 May 1972 under the circumstances depicted in the following paragraphs.

2. Ribax, Inc. is a corporation organized under the law of Florida. It owns Thee Que Nee Tue. The defendant J. R. Baxter owns Ribax, Inc., with the exception of an insignificant interest held by his wife. At all times pertinent to this action Mr. Baxter was the captain of Thee Que Nee Tue. No evidence has been presented to sustain any claim against defendants Annie P. Baxter, W. P. Riggs, and Marie Riggs.

3. Thee Que Nee Tue is a sixty-foot sightseeing and party boat designed to operate on Lake Tohopekaliga, a navigable inland lake in Central Florida. For passenger accommodation, the vessel has two decks, one above the other, situated aft of the pilot house. See defendants' Exhibit 5 which depicts the vessel substantially as she appeared at the time of the accident. The vessel carried ninety life jackets stowed in a marked compartment adjacent to the upper deck and a life ring. Similar flotation equipment was carried in a locker on the lower deck. A life ring was mounted next to the pilot house door for use on the lower deck. On the night of the accident, the vessel had a small boat in tow.

4. The ship's crew consisted of Lance Fender, Fred Rykert, Captain Baxter and Annie P. Baxter, the captain's wife. Lance Fender was eighteen years old. He had been working on the vessel (which sailed mainly on weekends) for approximately ten months prior to the accident. Fred Rykert, age sixty-nine or seventy, had been working on the vessel about eighteen months. Mr. Baxter's wife was on board to tend a snack bar which was located aft of the helm. The snack bar served soft drinks and food items.

5. Three or four weeks before the accident, the defendant J. R. Baxter was contacted about the possibility of chartering Thee Que Nee Tue for an evening excursion. Following the initial contact, Mr. Baxter arrived at an oral agreement with Ruth Ann Jones and Mike and Ann Niedenthal to charter the vessel to them. The charterers intended to use the vessel as the site for a party for about eighty people. It was their purpose to sell tickets at $7.00 per ticket and to provide food, beer and a band. The charterers contemplated more of such events if the one in question returned a profit. The ticket sales were largely made to employees of a hotel at which Mr. Niedenthal was employed. When Mr. Baxter agreed to furnish the vessel, he inquired about the ages he might expect on board and was led to believe such persons would be of sufficient age to legally consume alcoholic beverages.

6. Mr. Baxter agreed to furnish to the charterers the vessel and her crew for a rate of $40.00 per hour for a three-hour cruise on Lake Tohopekaliga. All food and beverages were to be provided by the charterers, except that which was provided for sale in the vessel's snack bar.

7. On the night in question, Thee Que Nee Tue left her dock at Kissimmee, Florida at approximately 1:30 A.M. Sometime between 3:00 and 4:00 A.M. when the vessel was approximately 1.5 miles from her dock and heading home, the plaintiffs' decedent Dewey Shane Palmer, called Shane by friends and family, was seated on the port side rail of the upper deck. The rail is forty-two inches high and surrounds the deck. On one side of Shane was a male friend, Leslie Moree, age twenty-two. On the other side was a female partygoer by the name of Won Stabler. The trio was watching a band which was playing on the upper deck when, according to the unrefuted testimony of Mr. Moree and Mrs. Stabler, Shane, without warning and for no apparent reason, lifted and

swung his legs outside the rail. He thereupon lost his grip and plunged into the water. Although they made immediate efforts to sight him, neither Mr. Moree nor Mrs. Stabler saw Shane return to the surface. The only reasonable conclusion from the evidence is that Dewey Shane Palmer drowned almost immediately after entering the water.

8. Approximately twenty to thirty minutes before the accident, Mr. Baxter noticed Dewey Shane Palmer on the forward deck in front of the pilot house. He thought Shane was about to be sick, although upon approaching him he smelled no alcohol about his person. Captain Baxter left the pilot house in the charge of another crewman, Fred Rykert, and took the boy to a seat on the lower deck. There Shane told the captain that he would be unable to swim if he were to fall overboard because of a recent illness. According to Mr. Baxter, Shane was coherent, but his movements were quick and jerky. Mr. Baxter at this point went to the upper deck and told Mr. and Mrs. Niedenthal about Shane's conduct and left him in their care.

9. Thereafter and before the accident occurred, on Mr. Baxter's orders, Lance Fender, a member of the crew, laid out seven or eight life jackets on the rail at various locations around both the upper and lower decks. Mr. Baxter, after giving the abovementioned order to Lance Fender, returned to the pilot house where he remained until he heard of the accident. Prior to the accident, the captain visually inspected the activity on the decks from positions in and adjacent to the pilot house, but he observed nothing unusual.

10. When Dewey Shane Palmer went overboard, Leslie Moree ran to the stern of the vessel in an effort to sight him. Failing in that, Moree proceeded to the bow and told Lance Fender who was then standing on the forward deck that a man was overboard. Fender immediately alerted the captain.

11. At the point where Shane went overboard, the shore of the lake and an adjacent island formed a channel about one hundred fifty yards wide. When Captain Baxter learned of the accident, he turned the vessel and returned to the point in the channel where it was believed Shane went overboard. The area was scanned by Lance Fender and the other male crew member, Fred Rykert. Each man was using battery operated lights.

12. When these efforts proved useless, the vessel returned to dock leaving Lance Fender and another person, not a member of the crew, at the scene in the small boat to continue the search.

13. Since the evidence compels the conclusion that Dewey Shane Palmer died almost immediately upon entering the water, the rescue efforts of the ship's crew are immaterial to the liability issue in this case. On 17 May 1972, an autopsy was done on the body of Dewey Shane Palmer by a pathologist, Dr. G. V. Ruiz. Dr. Ruiz determined that the blood alcohol content of the body at the time of death was .32. The doctor testified that a blood alcohol content of .1 is normally considered the level of intoxication.

14. Prior to the accident, the captain had instructed the crew to watch out for the passengers and to prevent persons from sitting on the deck rails. An announcement was customarily made over the vessel's public address system before the vessel left the dock for the purpose of warning all passengers to stay off the rails. On the night in question and before the accident, Captain Baxter specifically told Lance Fender to keep people off the rails. This specific admonition was inspired by the captain's having seen several of the passengers seated on the rail. Before the accident, the captain remarked that Shane was acting "funny" and told Lance Fender he did not want to take any chances with the young man. The captain did not, however, specifically identify Dewey Shane Palmer for Lance Fender.

15. At the time Shane went overboard, no member of the crew was on the upper deck, although a short time

before, Lance Fender had walked the length of that deck. Captain Baxter and Fred Rykert were in the pilot house at the helm and Lance Fender was on the forward deck. Mrs. Baxter was in the snack bar.

16. The deceased was born on 6 June 1953. He was nearly nineteen at the time of the accident. Shane was the plaintiffs' only son. They have six other children, ages six, eight, ten, twelve, fifteen and twenty-four. The twenty-four-year-old is a married daughter. Over a year before his death, Dewey Shane Palmer terminated his high school education during his freshman year of high school. Thereafter he worked as a laborer on construction projects, but he continued to reside in his parents' home until the time of his death. At the time of their son's death, Mr. and Mrs. Palmer were age forty and thirty-nine respectively.

17. His father testified that Shane had planned to go to a trade school and pursue a career in agriculture. According to Mr. Palmer, his son was an average student and was quite compatible with his family members. His father testified that before the accident Shane had broken a shoulder and had had a pin removed from the shoulder several weeks before his death. Mr. Palmer also testified that on occasion Shane contributed some of his wages to the family. How much is not established by the evidence, nor does the evidence support an inference that Mr. and Mrs. Palmer were in any respect dependent on their son. The evidence does reveal, however, that Shane on occasion took care of his sisters for the benefit of his mother.

18. The evidence reveals that both plaintiffs have suffered and will continue to suffer grief over the loss of their child and have lost his companionship and assistance to the family unit which would have been rendered, but for his death.

19. After the evidence was presented to the Court and at the time of the closing argument, the attorney for the plaintiffs and the attorney for Ribax,

Inc., Mr. and Mrs. Baxter, and Thee Que Nee Tue stipulated that if a judgment for damages is to be entered in plaintiffs' favor, it should be entered against the corporation, against Mr. Baxter, and against the vessel, but not against Mrs. Baxter.

## DISCUSSION

At least four questions of law evolve from the facts of this case: (1) what law governs; (2) under the governing body of law, what is the basis for liability; (3) who may recover, and (4) what may be recovered.

Before the decision in *Moragne v. United States Marine Lines, Inc.*, 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339, actions in federal court for wrongful deaths occurring on waters within a particular state were governed by the laws of the state in whose territory the death occurred. See *Western Fuel Co. v. Garcia*, 1921, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210, and *Emerson v. Holloway Concrete Products*, C.A.5, 1960, 282 F.2d 271. In *Moragne*, however, the Supreme Court created a federal maritime remedy for wrongful death which applies to deaths on the high seas as well as on navigable waters within a state. *Law v. Sea Drilling Corp.*, C.A.5, 1975, 523 F.2d 793. In *Law v. Sea Drilling Corp.*, the Court of Appeals pointed out that *Moragne* and *Sea Land Services v. Gaudet*, 1973, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, have displaced state law remedies for wrongful death and substituted therefor a maritime cause of action.

■ The bases for recovery under the new cause of action are maritime principles of negligence and, where the deceased was a crew member, seaworthiness. See *Branch v. Schuman*, C.A.5, 1971, 445 F.2d 175; *In re Dearborn Marine Services, Inc.*, C.A.5, 1974, 499 F.2d 263; *Isham v. Pacific Far East Line Inc.*, C.A.9, 1973, 476 F.2d 835; *Tullis v. Fidelity and Casualty Company of New York*, C.A.5, 1968, 397 F.2d 22; *Brewer v. E. J. Platt Fisheries, Inc.*, C.A.5, 1975, 511 F.2d 182.

In *Moragne* and *Sea Land Services,* the Court did not undertake a complete delineation of the legal system it germinated, and each case involved claimants dependent on the deceased person. The question, therefore, remains as to whether or not a non-dependent parent is covered by the new maritime remedy and, if so, to what extent.

In *Sea Land Services v. Gaudet,* supra, the Court recognized a widow's right to recover for the loss of her husband's society and rejected the contention that recovery should be limited to pecuniary items such as loss of support. In that case the Court defined this element of damage in terms which suggest that a non-dependent parent may recover for its loss if adequately proved. The Court said, 414 U.S. at page 585, 94 S.Ct. at page 815: ". . . the term 'society' embraces a broad range of mutual benefits *each family member* receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, and protection. . ." (Emphasis added.)

In *Law v. Sea Drilling Corp.,* supra, the Fifth Circuit said at page 389, 523 F.2d at page 795:

"Loss of society is clearly a wrongful death item of recovery. The loss— and the damages—belongs to the dependent not to the decedent . . ."

That case involved an action by and for dependents. The Court's opinion, therefore, should not be taken as foreclosing a non-dependent from recovery. This interpretation is supported by language of the Court on the same page wherein it stated, ". . . wrongful death recovery compensates the decedent's dependents and *other survivors* for the damages they incurred due to the death . . ." (Emphasis added.) See also *Dennis v. Central Gulf Steamship Corp.,* C.A.5, 1972, 453 F.2d 137, where the Court permitted a thirty-one year old daughter to recover for loss of support and services occasioned by her father's death, even though she was not dependent on her father.

At the time of Dewey Shane Palmer's death, the law of Florida permitted the father of a minor (then one under age twenty-one) to recover ". . . such sum for the mental pain and suffering of the parent (or both parents) if they survive, as the jury may assess. . . ." See Section 768.03(1), Florida Statutes 1972. Federal maritime law, however, denies recovery for this item, *Sea Land Services v. Gaudet,* supra, n. 17, 414 U.S. at page 585, 94 S.Ct. 806, and *Petition of M/V Elaine Jones,* C.A.5, 1973, 480 F.2d 11. If, therefore, the parents were denied standing as beneficiaries of the maritime claim, at least for purposes of recovering for loss of society, an irony would indeed exist. On the one hand, the parents' claim under state law would have been effectively destroyed and, on the other hand, the parents would be accorded no comparable maritime remedy.

■ For the foregoing reasons, this court concludes that the parents may bring a *Moragne* type wrongful death action to recover for loss of society actually caused by the death of their child.

■ The last question is what, if any, other items are recoverable in the present action. It is reasonably plain as a matter of law that a recovery may be had by the decedent's personal representative for the decedent's pain and suffering before death and funeral expenses. *Law v. Sea Drilling Corp.,* supra, and *Petition of M/V Elaine Jones,* supra.

■ Finally, it has been recognized that the decedent's own contributory negligence proportionately reduces the claimant's recovery. See *Landry v. Two R. Drilling Company,* C.A.5, 1975, 511 F.2d 138, n. 4 at page 143.

*Conclusions of Law*

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1333. The Court has in personam jurisdiction over the individual defendants by service of process. The Court has in rem jurisdiction over Thee Que Nee Tue by virtue of the stipulation of counsel referred to in

paragraph 19 above and the vessel's appearance through its attorney.

 2. The defendant J. R. Baxter failed to exercise reasonable care under the circumstances in the following respects: (1) after having acquired knowledge of Dewey Shane Palmer's physical condition and apparent state of mind, in failing to identify him to the other crew members as being a guest who presented a substantial risk of injury to himself; and (2) after having acquired such knowledge, in failing to place crew members on passenger decks to enforce the vessel's own safety rule against rail sitting and to observe the passengers in general and Dewey Shane Palmer in particular.

3. The defaults referred to in paragraph 2 above contributed substantially to the event of Dewey Shane Palmer's death.

 4. Dewey Shane Palmer contributed substantially to his own death and was negligent in consuming alcoholic beverages to such an extent that he did not appreciate the danger of his own conduct. Such negligence was seventy-five percent of the cause of the event.

5. At the time of Dewey Shane Palmer's death and at all times relevant to this claim, J. R. Baxter was an agent of the defendant Ribax, Inc. and was acting within the course and scope of that agency.

6. The plaintiffs failed to prove by a preponderance of the evidence that Dewey Shane Palmer experienced pain and suffering prior to his death.

7. Plaintiffs have each sustained damages in the amount of $10,000.00 for loss of their son's society. Such damages are subject to a seventy-five percent reduction by reason of Dewey Shane Palmer's contributory negligence. Plaintiffs are, therefore, each entitled to judgment against the defendants J. R. Baxter and Ribax, Inc., jointly and severally, in the amount of $2,500.00.

8. Mr. Palmer, as personal representative of his son's estate, has incurred expenses in the amount of $1114.78 for funeral and burial expenses and is entitled to judgment for twenty-five percent of that sum against defendants J. R. Baxter and Ribax, Inc., jointly and severally.

 9. The plaintiffs are entitled to a maritime lien on Thee Que Nee Tue for their damages and such costs as may hereafter be assessed in accordance with Rule 54, Fed.R.Civ.P., and 28 U.S.C. § 1920.

10. This cause should be dismissed with prejudice as to defendants W. P. Riggs, Marie Riggs, and Annie P. Baxter.