

NUMBER 13-11-00392-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CHRISTOPHER ARTHEY AND
DENISE ARTHEY,                                                          Appellants,

v.

SCHLUMBERGER TECHNOLOGY
CORPORATION,                                                           Appellee.

On appeal from the 267th District Court
of Refugio County, Texas.

# O P I N I O N

Before Chief Justice Valdez and Justices Garza and Vela
Opinion by Justice Garza

Appellants, Christopher and Denise Arthey, challenge the trial court's summary

judgment in favor of appellee, Schlumberger Technology Corporation ("Schlumberger"),

in a personal injury case.  By two issues, the Artheys contend that the trial court erred in granting summary judgment on the basis that Schlumberger owed no duty to the Artheys, either under general maritime law or the Texas Dram Shop Act.[1]  We reverse and remand.

## I. BACKGROUND

The accident made the subject of the underlying lawsuit occurred on the afternoon of May 16, 2008.  The Artheys, riding motorcycles, were struck head-on by a vehicle driven by David Huff on State Highway 35 north of Port Aransas, Texas.  The Artheys suffered severe injuries, with each requiring the amputation of a leg.  Texas Department of Public Safety officer Danny Leon White, who responded to the accident, stated that there was no detectable odor of alcohol on Huff's person.  Nevertheless, witness statements established that Huff was driving erratically immediately prior to the accident.  Moreover, three hours after the accident, Huff's blood alcohol content ("BAC") was measured at .25.  Huff subsequently pleaded guilty to the criminal offense of intoxication assault and was placed on community supervision.

The Artheys sued Schlumberger and several other individuals and entities not parties to this appeal.  Schlumberger filed a traditional motion for summary judgment, arguing that it owed no duty to the Artheys as a matter of law.  The summary judgment

---

[1] The Texas Dram Shop Act provides in part:

Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter . . . upon proof that:

(1)  at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others;  and

(2)  the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX. ALCO. BEV. CODE ANN. § 2.02(b) (West 2007).

2

evidence established that, at the time of the accident, Huff was returning home from a three-day fishing trip organized by Schlumberger at the Shoal Grass Lodge in Port Aransas. Huff, an employee of Petrobras America, Inc. ("Petrobras"), was invited by Schlumberger to attend the fishing trip. According to Winston Hey, the Schlumberger employee who invited Huff, "The reason I invited [Huff] is basically to thank him for his business and hope to strengthen the business relationship."[2] Huff and another Schlumberger employee, William Ney, went out on a fishing boat on the morning of the accident. The parties dispute whether alcohol was served or consumed on that boat. It is undisputed, however, that Huff was extremely intoxicated at the time he collided with the Artheys several hours later.

Schlumberger claimed in its summary judgment motion that it owed no duty to the Artheys to refrain from providing alcohol to Huff. It claims that, although alcohol was provided at the lodge, none was provided on the fishing boats and, if individuals wished to consume alcohol on the boats, they had to bring it themselves.[3] Schlumberger noted that Huff, in deposition testimony, did not recall consuming alcohol on May 16, although he conceded that he was "significantly intoxicated" at the time of the accident.

The Artheys filed a response that included deposition testimony and an expert affidavit by Ernest D. Lykissa, Ph.D. Dr. Lykissa, a clinical and forensic toxicologist, stated that he reviewed the deposition testimony in the case. He opined:

> It is my professional opinion that based on the above listed reviewed testimonies and particularly of the observation of the first responder DPS Officer Danny Leon White, that there was no detectable alcohol smell in

---

[2] Petrobras America had previously purchased software from Schlumberger that assisted in interpreting seismic data. Huff denied that any business was discussed during the trip.

[3] As detailed further herein, the evidence showed that individuals were permitted to take alcohol that was provided by Schlumberger at the lodge and bring it onto the fishing boats to consume.

3

Mr. Huff's breath on May 16, 2008 after the Motor Vehicle Accident, that Mr. Huff had consumed copious amounts of Ethanol (alcohol) drinks (equal to 12 beers or glasses of wine, or ounces of Crown Royal Bourbon Whiskey). This is substantiated by the facts that his blood alcohol registered 0.25 g/dL (%) 3 hours after the accident. The significance of lack of obvious alcohol smell to a trained observer is that, he had consumed the alcohol [a] long time before the accident, which fact places him in the boat he was fishing in 2 hours prior to the accident.

In an "addendum" to his affidavit, Dr. Lykissa added:

The scientific methodologies utilized by my person to arrive at my conclusions are based on 0.02g/dL Ethanol burn-off per hour. Therefore, the alcohol level measured in a blood sample collected of Mr. Huff 3 hours after the accident, by utilizing retrograde extrapolation adjust the blood alcohol concentration of Mr. Huff up-to 0.31 g/dL (%).

In addition consumption of alcohol containing drinks is associated with a characteristic odor of alcohol plus drink congeners for a period of 1–2 hours post consumption. Therefore, the lack of a detectable alcoholic breath odor in Mr. Huff by the State Trooper, is very significant in a forensic extrapolation of the facts, in establishing a timeline for the consumption of the 12 drinks that were detectable in Mr. Huff's system following the accident.

The trial court granted Schlumberger's motion for summary judgment and rendered judgment that the Artheys take nothing. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

To obtain a traditional summary judgment under Texas Rule of Civil Procedure 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005) (citing *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991)). In reviewing a summary judgment, we consider the evidence in the light most favorable to the non-movant and resolve any doubt in the non-movant's favor. *Id.*

4

In a negligence case, the existence of a duty is typically a threshold question of law which the trial court decides based on the particular facts surrounding the occurrence in question. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Nat'l Convenience Stores, Inc. v. Matherne*, 987 S.W.2d 145, 148 (Tex. App.—Houston [14th Dist.] 1999, no pet.). If there is no duty, liability for negligence cannot exist. *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999). "[F]actors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer." *Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d 401, 405 (Tex. 2009) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)). Foreseeability of the risk has been called the foremost and dominant consideration in the duty analysis. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). The test for foreseeability is what a party should, under the circumstances, reasonably anticipate as a consequence of its conduct. *J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.*, 302 S.W.3d 515, 533 (Tex. App.—Austin 2009, no pet.) (citing *Foster v. Denton Indep. Sch. Dist.*, 73 S.W.3d 454, 465 (Tex. App.—Fort Worth 2002, no pet.)).

Though the existence of duty is a question of law when all of the essential facts are undisputed, when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury. *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 474 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.).

**B.      Jurisdiction**

In their seventh amended petition, the Artheys allege that their claims arise under general maritime jurisdiction.  *See* 46 U.S.C. § 30101(a) (2012).  A holding that a particular occurrence is within admiralty jurisdiction generally amounts to a holding that the law governing that occurrence is substantive maritime law.  *Crear v. Omega Protein, Inc.*, 2002 U.S. Dist. LEXIS 15759, at *5–6 (E.D. La. Aug. 20, 2002).  Schlumberger did not specifically address the applicability of admiralty jurisdiction in its motion for summary judgment; nonetheless, we will construe its claim of "no duty" broadly. Because the breach allegedly occurred on a vessel and the Artheys' damages occurred on land, it is appropriate to first determine whether admiralty jurisdiction is applicable. *See id.*

Section 30101 of title 46 of the United States Code provides that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."  46 U.S.C. § 30101(a).  To determine the applicability of admiralty jurisdiction, the United States Supreme Court has devised a two-pronged test which focuses on both the location of the incident in question and the connection between the incident and the federal interest in the protection of maritime commerce.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Under the first prong, the "location" test, a court must determine whether the tort occurred on navigable water or whether the injury suffered on land was caused by a vessel on navigable water.  *Id.*; *see Young v. Players Lake Charles, L.L.C.*, 47 F. Supp. 2d 832, 834 (S.D. Tex. 1999).  Under the second

6

prong, the "connection" test, the court must consider two issues: (1) whether, based on the "general features of the type of accident involved," the incident has a "potentially disruptive impact on maritime commerce"; and (2) whether the general character of the activity giving rise to the incident bears a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (citing *Sisson v. Ruby*, 497 U.S. 358, 364 n.2 (1990)); *see id.* at 547 (recognizing a presumption in favor of "seeing jurisdiction as the norm when the tort originates with a vessel in navigable waters, and in treating departure from the locality principle as the exception"). In this case, the tort alleged is the provision of excess alcohol on the fishing boat that resulted in Huff's intoxication and the general activity giving rise to the incident is the sponsored fishing trip.

### 1.    The Location Prong

Historically, admiralty jurisdiction hinged exclusively on location. *See id.* at 531–32. "The traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Id.* The locality issue was addressed with Congress's passage of the Extension of Admiralty Jurisdiction Act. *See* 46 U.S.C. § 30101. After the Extension Act, the "location" test is satisfied if the act occurred on navigable water *or* if the injury suffered on land was caused by a vessel on navigable waters. *Id.* § 30101(a); *see Grubart*, 513 U.S. at 534. Although the Artheys' injuries occurred on land, the jurisdictional focus is on the activity that "caused" the injury, regardless where or when the injury manifests itself or is "consummated." *See* 46 U.S.C. § 30101; *Grubart*, 513 U.S. at 535–46 (rejecting the argument that the property damage at issue in that case "must be close in time and space to the activity that

7

caused it"); *see also In re Asbestos Litig.*, 2012 Del. Super. LEXIS 177, at *18 (Del. Super. Ct. Feb. 15, 2012).

Courts have routinely held that admiralty jurisdiction applies in cases involving passengers who are served excessive amounts of alcohol on vessels, and after disembarking, are involved in on-shore automobile accidents. *See, e.g., Bay Casino, L.L.C. v. M/V Royal Empress*, 199 F.R.D. 464, 465 (E.D.N.Y. 1999) (finding location prong satisfied where claims arose from motor vehicle accident but alleged negligence was "the provision of large amounts of alcohol to an underage customer attending [a] gambling cruise"); *Young*, 47 F. Supp. 2d at 834 (finding location prong satisfied where "the alleged negligence, the serving of copious amounts of alcohol on the casino boat, occurred on navigable waters"); *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 145 (Iowa 2002) (finding location prong satisfied in automobile accident case where the "harm complained of—the sale and service of alcohol to an intoxicated adult—occurred on a vessel"). Here, the provision of alcohol is alleged to have taken place on the fishing boat; if that allegation is correct, the tort occurred on navigable waters and the case will sound in admiralty. Considering the evidence in the light most favorable to the Artheys, *see W. Invs., Inc.*, 162 S.W.3d at 550, we conclude that the first prong of the *Grubart* test has been met.

**2.    The Connection Prong**

The first issue under the connection prong requires us to consider the potential for a disruptive impact on maritime commerce. *Grubart*, 513 U.S. at 534. In *Grubart*, the United States Supreme Court stated that, for purposes of the disruptive impact factor, the incident at issue must be defined at an "intermediate level of possible

generality" by "ask[ing] whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Id.* at 538. Defining the incident at an "intermediate level of possible generality," the *Young* court found that the provision of "copious amounts of alcohol" to passengers on a boat was a potentially negligent condition affecting passengers aboard the vessel. *Young*, 47 F. Supp. 2d at 834 (noting that "[i]t is not difficult to imagine a slightly different scenario from the case at bar in which an intoxicated passenger falls down a stairway or into the water. . . . Such an incident could lead to a disruption as rescue crews attempt to locate and save the passenger or search for his body").

The second issue of the connection prong considers "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart,* 513 U.S. at 539. The relevant activity "is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Sisson,* 497 U.S. at 364. We must ask whether the alleged tortfeasor's activity "on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Grubart,* 513 U.S. at 539–40. "Navigation of boats in navigable waters clearly falls within the substantial relationship." *Id.* at 540 (citing *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982)); *see In re Asbestos Litig.*, 2012 Del. Super. LEXIS 177, at *22–23. Here, the sponsored fishing boat is similar to cruise and sightseeing vessels that regularly transport passengers over navigable waters. Courts have consistently stated that torts on such vessels satisfy the traditional maritime activity requirement. *Young*, 47 F. Supp. 2d at 835 (citing *Palmer v. Fayard*

9

*Moving & Transp. Corp.*, 930 F.2d 437, 441 (5th Cir. 1991); *Butler v. Am. Trawler Co.*, 887 F.2d 20, 21-22 (1st Cir. 1989); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 207 (1st Cir. 1988); *Luby v. Carnival Cruise Lines*, 633 F. Supp. 40, 41 n.2 (S.D. Fla. 1986); *Palmer v. Ribax*, 407 F. Supp. 974, 978–79 (D. Fla. 1976)).

Viewing the facts in this case at the level of generality that the Supreme Court requires, and in light of the presumption in favor of finding maritime jurisdiction over injuries caused by or on vessels in navigable waters, *see Grubart*, 513 U.S. at 537, we conclude that the connection prong of the *Grubart* test is met. The type of activity at issue in this case poses a risk of potential disruption of maritime commerce that is more than merely "fanciful," *Grubart*, 513 U.S. at 539, and the activities of Schlumberger in sponsoring fishing trips can be viewed as bearing a substantial relationship to traditional maritime activities. Because both the location and connection prongs of the *Grubart* test are met, this case falls within maritime jurisdiction.

Federal maritime law therefore governs the substantive law of this case. *See Crear*, 2002 U.S. Dist. LEXIS 15759, at *5–6. Federal courts exercising admiralty jurisdiction have recognized that a defendant can be held liable at maritime law for providing alcohol without adequate supervision. In *Their v. Lykes Bros., Inc.*, 900 F. Supp. 864, 866 (S.D. Tex. 1995), plaintiff Fred Their, an employee on a vessel owned by the defendants, was seriously injured in a one-car accident that occurred shortly after the car left the dock where the vessel was berthed. The chief officer of the vessel, Robert Borzi, was driving the car and died as a result of the crash. *Id.* At the time of the crash, Borzi was legally intoxicated. *Id.* The federal district court found that Borzi consumed the alcohol while he was on the vessel. *Id.* at 869. The court concluded that

10

the defendants, the owners of the vessel, were "negligent in operating a floating dram shop with insufficient supervision to prevent Mr. Borzi from becoming intoxicated while on the vessel, and this negligence was a proximate and producing cause of [Their]'s damages." *Id.* at 878. The defendants "were negligent in failing to monitor alcohol consumption onboard, fostering a party atmosphere, and failing to prohibit drunk officers from driving . . . ." *Id.* at 879. Accordingly, regardless of whether Their or Borzi were in the course and scope of their employment at the time of crash, the defendants were "completely liable, jointly and severally, to [Their] for his damages sustained as a result of the subject incident . . . ." *Id.*; *see Young*, 47 F. Supp. 2d at 835; *see also Reyes v. Vantage S.S. Co.*, 609 F.2d 140, 141–46 (5th Cir. 1980) (holding that plaintiff could maintain an action for negligent rescue and stating that, in assessing the plaintiff's contributory negligence, the lower court must consider the defendant's role in operating a "floating dram shop" from which crew members obtained intoxicants with no supervision).

## C.    Summary Judgment Evidence

We now review the summary judgment evidence to determine whether Schlumberger established as a matter of general maritime law that it owed no duty to the Artheys. The summary judgment evidence included excerpts from the depositions of Huff, Hey, and Ney. It also included the transcript from the punishment phase of Huff's criminal trial after his plea of guilty, and documents and information emailed to Huff.

Hey is a salesperson for Schlumberger. Hey had spoken to Huff in the past about Schlumberger products that he would like to sell to Petrobras. Hey asked Huff via

11

email whether he was interested in going on the fishing trip. Subsequently Huff received an invitation from Cindy Hassler of Schlumberger. Although Huff denied that any business was discussed on the fishing trip, there is no question that the purpose of the trip was to foster the business relationship between Huff and Sclumberger. The trip was sponsored by Schlumberger and no friends of Huff went on the trip. Hey testified that the reason Huff was invited was to thank him for his business and to strengthen the business relationship. An email dated April 24, 2008, from Hassler set forth guidelines for who should be invited on the trip: "Slots are for clients and account managers. (1) Clients who have done significant business (revenue) over last six to 12 months. (2) Clients who will be doing significant business in 2008."

Huff stated in his deposition that he is a geophysicist and exploration manager. At the time of his deposition, Huff had been employed by Petrobras for nearly eight years. Huff stated that he believes there were six people on the Schlumberger trip; at least three were from Schlumberger. There were no other people staying at the Shoal Grass Lodge other than those that were part of the trip.

Huff arrived at the Shoal Grass Lodge on Wednesday evening. He ate dinner there. There was an open bar at the lodge. Huff had a drink about an hour after he arrived on Wednesday. He drank bourbon and wine. The meal and liquor were provided free of charge.

Huff stated that there was no alcohol available directly on board the boat: "If you wanted some [alcohol], you had to—you had to physically go and get it from either the bar—from the bar or your own if you brought some." Huff recalled "several people getting a bag of ice and putting beers in the bag of ice" on Thursday to take on the boat.

12

He conceded that "[t]here was some beer on the boat." He thought there was some heavy drinking going on Thursday on the boat, and he did not recall any reason to believe it was any different on Friday.

Huff did not dispute that he was driving the vehicle that collided with the Artheys' motorcycle while significantly intoxicated, although he had no recollection of doing so. He did not remember consuming alcohol on Friday or driving from Aransas Pass to the site of the accident. Huff thought he remembered walking to the dock that morning, and he thought he remembered catching a fish.

Ney met Huff on the fishing trip; he had not met him before. On Friday, Ney, Huff and the boat captain went out on the boat to fish. Ney recalls that they fished for about three or four hours and returned to the dock around 12:30 or 1:00 p.m. The fish were cleaned at the dock. He left the lodge before Huff did. Ney testified: "I know that he did not drink hard alcohol on the boat but there were cans on the boat." When asked if there was beer on the boat, Ney stated, "I do not remember beer being on the boat on Friday. I know there was beer on the boat on Thursday and that I had one on the—on the boat on Thursday. I do not know about Friday." Ney testified that Huff spent most of his time on the boat sleeping. Ney stated:

> I woke him up to catch the fish. . . . When a fish was hooked, I would wake him up; and then he'd reel—reel in the fish. . . . I recall seeing him drinking, but it was out of something in a koozie[4] on the boat but what was in that koozie, I don't know, because he put it in the koozie.

Ney agreed that as the host of the event, Schlumberger could have decided not to permit beer or alcohol on the boat. He acknowledged that Schlumberger controlled who

---

[4] A koozie is a fabric or foam device that is designed to insulate a beverage can or bottle. Wikipedia, "Beer Koozie," http://en.wikipedia.org/wiki/Beer_koozie (last visited August 15, 2012).

13

was on the boat, what was served on the boat, and how long they remained on the boat.

Officer White investigated the crash. When he first arrived on scene, he spoke with Huff and other witnesses. He suspected intoxication based on witness accounts. However, while talking to Huff, he could not smell alcohol on his breath so he obtained Huff's medical records. The medical records included an analysis of the blood sample that was drawn at the hospital where Huff was taken following the incident. Huff's BAC was .25 approximately three hours after the crash.

Dr. Lykissa, a clinical and forensic toxicologist, provided an affidavit in support of the Artheys' response to Schlumberger's motion for summary judgment. As set forth above, Dr. Lykissa performed an analysis to determine Huff's BAC at the time of the collision, and he also conducted forensic analysis to determine the time frame in which the alcohol was actually consumed by Huff. Based on the rate of elimination, Dr. Lykissa determined that Huff's BAC at the time of the accident—2:34 p.m.—was .31. According to Dr. Lykissa, the fact that the Officer White was unable to smell alcohol on Huff indicates that Huff was not drinking within one hour prior to the accident. According to the evidence, the earliest Huff got off the water was 12:30 p.m.

Dr. Lykissa's stated that, in the one hour between when he got off the boat, at 12:30 p.m., and 1:30 p.m., when he departed, Huff would have had to consume at least twelve drinks in order to attain a BAC of .31. In Dr. Lykissa's opinion, Huff could not have consumed twelve or more drinks in that hour; if he had done so, he would likely have become so sick and incapacitated so as not to have been able to drive himself to the scene of the accident, roughly 40 miles from where he got off the water, by 2:34

14

p.m. This analysis led Dr. Lykissa to opine that Huff became intoxicated over a greater period of time—that is, over more than the one hour between 12:30 and 1:30—which means that he would have reached a BAC of .31 while still on the water, prior to docking around 12:30 p.m. According to Dr. Lykissa, being unable to stay awake is a classic symptom of high-level intoxication that is often exhibited by those whose BAC climbs above the .2 level towards the .3 level.

The invitation sent by Schlumberger described the trip as a "two-day fishing get-away at Shoal Grass Lodge." The invitation described the lodge as "a 10,000 square feet facility [with] 12 bedrooms, a game room and a great room, *bar,* commercial kitchen and a large conference room. . . . The lodge has a gorgeous great room looking out of Aransas Bay with an *open bar* which is included." (Emphases added.) The invitation also included the following schedule:

> May 14    Arrive Shoal Grass Lodge for check-in after 3:00 p.m., where you can relax, and enjoy the view and *open bar* from the great room with dinner and appetizers in the evening. Pier fishing options out back.
>
> May 15    After breakfast, you'll be met at the private docket (right out back) for a day of fishing with three anglers per boat. You'll enjoy lunch on the water and be back in time for an afternoon *cocktail* to watch the sunset. *Cocktails* and dinner will be served in the evening.
>
> May 16    After breakfast, you'll be met for a second day of guided fishing from which you'll return based on travel arrangements in time to catch your flight or ride home. Check-out will be between 1 and 2 p.m.

(Emphases added.) The questionnaire sent to participants for the "Schlumberger Fishing Fling" asked for name, arrival time, angling experience, preferred reels, preferred fishing method, and preferred liquors.

15

The invoice to Schlumberger from Fishing Tackle Unlimited reflected that the price charged to Schlumberger included liquor at the lodge. It also stated: "Not included: . . . alcohol for the boat (We can set this up ahead of time but is done separately from the lodge) . . . ."

In an email dated May 13, 2008, Hassler stated that she had reviewed the contract, "including alcohol, tips, etc." She further stated: "Shoal Grass Lodge has an open bar and that is included in our package. The lodge does not provide alcohol on the boats so if anyone wants beer while they are out on the water, get with Andy [Packmore] and he can help to make that happen." Packmore stated in an answer to an interrogatory that "Shoal Grass Lodge served alcohol from an open bar as part of the package purchased by Schlumberger."

The summary judgment evidence established that Huff was drinking an unknown beverage from cans on the boat and was having trouble staying awake; that Huff was extremely intoxicated at the time he got off the boat; and that Schlumberger representatives, through their emails and invitations, encouraged alcohol consumption during the entire trip, including while fishing from boats. This evidence raised a genuine issue of material fact as to whether Schlumberger allowed a "party atmosphere" to prevail during the entire fishing trip, whether Huff became intoxicated while on the boat, and whether Schlumberger operated a "floating dram shop" that resulted in Huff's intoxication. *See Thier*, 900 F. Supp. at 866; *Reyes*, 609 F.2d at 141–46. If these facts are proven true, then Schlumberger owed a duty of ordinary care to the Artheys under maritime law. *See Young*, 47 F. Supp. 2d at 835.

16

Because a fact issue existed regarding Schlumberger's duty to the Artheys, summary judgment was improper. *See Mitchell v. Mo.-Kan.-Tex. R.R. Co.*, 786 S.W.2d 659, 662 (Tex. 1990) ("While foreseeability as an element of duty may frequently be determined as a matter of law, in some instances it involves the resolution of disputed facts or inferences which are inappropriate for legal resolution."), *overruled on other grounds by Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162 (Tex. 2002). The Artheys' first issue is sustained.[5]

## III. CONCLUSION

We reverse the trial court's summary judgment and remand for further proceedings consistent with this opinion.

DORI CONTRERAS GARZA,
Justice

Dissenting Opinion by
Justice Rose Vela.

Delivered and filed the
8th day of November, 2012.

---

[5] In light of our conclusion that maritime jurisdiction applies, we need not address the Artheys' second issue, in which they argue that summary judgment was improper under the Texas Dram Shop Act. *See* TEX. R. APP. P. 47.1.

17